UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE BOSTON & MAINE CORP.,    *
                               *        Civil Action No. 70-00250-JLT
        Debtor.                *

MEMORANDUM

September 27, 2013

TAURO, J.

I.    Introduction

On June 17, 1983, this court discharged Debtor Boston & Maine Corporation ("BMC") from bankruptcy by a Consummation Order stating that BMC was forever discharged from all "obligations, debts, liabilities and claims."[1] The Consummation Order also enjoins the bringing of claims against BMC that were not filed prior to June 17, 1983. This court retained jurisdiction to "consider and take appropriate action with respect to the injunctive provisions of th[e] Order."[2] Plaintiff United States seeks leave to file a claim to recover environmental clean-up costs incurred by the United States Army ("Army") at property formerly owned by BMC in Ayer, Massachusetts. Plaintiff seeks to bring these claims pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") §§ 107(a) and 113(g)(2). For the reasons set forth below, Plaintiff's Motion for Leave to Pursue Claim [#2] is ALLOWED.

II.   Background

      A.    Factual Background

---

[1] Mem. Supp. [#3] Ex. 1 [hereinafter Consummation Order] § 5.03, at 6.

[2] Consummation Order § 8.02(f), at 31.

BMC is a common carrier operating railroad freight services in the northeastern United States. From approximately 1911 to 1935, BMC owned and operated a railroad roundhouse on a six-acre plot of land in Ayer, Massachusetts ("Roundhouse" or "Roundhouse Site").[3] Such roundhouses were used to perform maintenance on locomotives, which involved the use of hazardous substances.[4] The property is located on a portion of the former Fort Devens and is now entitled "Study Area 71" or, alternatively, "Area of Contamination 72."[5] The Roundhouse Site is bordered by Plow Shop Pond to the north and Boston & Maine Railroad to the east. BMC ceased operations at the Roundhouse Site in 1935 and the Roundhouse and other buildings were demolished. In 1942 BMC sold fifty-two acres of property to the Army, including the six-acre Roundhouse Site.[6] The Roundhouse property sat essentially vacant and unused from the time of the Army's purchase until cleanup activities were initiated at the site after environmental contamination was discovered in the early 1990s.[7]

Also located on former Fort Devens is the now-closed Shepley Hill Landfill ("Landfill"). From the early twentieth century until its closure in 1992, the Landfill was used to dispose of all varieties of military waste, including "waste oil, asbestos, incinerated pathological waste, construction debris, pesticides, and used needles and syringes."[8] The Landfill was capped and

---

[3] Mem. Supp. [#3] [hereinafter U.S. Mem.], 2.

[4] U.S. Mem. [#3] Ex. 3 [hereinafter MACTEC Report], 1-3.

[5] MACTEC Report, 1-3.

[6] MACTEC Report, 3; U.S. Mem. [#3] Ex. 4.

[7] MACTEC Report, 1-2; U.S. Mem. [#3], 2.

[8] Am. Opp'n [#36] [hereinafter BMC Opp'n], 2.

closed in four phases from 1986 to 1992.[9] Modern maps, which show the Landfill in its capped

and closed state, place the Landfill to the west and southwest of Plow Shop Pond, and thus far to

the west of the Roundhouse.[10] Historical aerial photographs of Fort Devens from 1952, 1965, and

1970 that were incorporated into a 1982 Environmental Protection Agency ("EPA") report on

Fort Devens also show the Landfill to the west of the Roundhouse Site, and a noticeable

distinction between the two areas.[11] A 1978 Army map also depicts the Landfill boundaries in a

manner consistent with the aerial photos and modern maps.[12] Other maps that appeared in 1970s

Army reports, and one used in a 1986 hydrogeologic investigation of the Landfill, show the

boundary of the area associated with the Landfill to extend much further east toward the Boston

& Maine Railroad.[13]

During the early 1970s, the Army conducted operational surveys to improve Fort Devens'

environmental compliance with then-existing regulations. A 1974 Army report on solid waste at

Fort Devens observed that the location of the landfill was "not . . . ideal," but that no more

---

[9] Mem. Supp. Mot. Limine [#47] Ex. 2 [hereinafter First Simeone Suppl. Decl.], 2-3. A 1994 environmental study commissioned by BMC reported that the Landfill may have been open and receiving waste as late as 1994. Reply [#37] [hereinafter U.S. Reply] Ex. 21. Whether or not this is accurate does not affect the outcome of this motion.

[10] See BMC Opp'n [#36] Ex. L; U.S. Reply [#37], 5. Relying on these maps, as well as other documents, Plaintiff contends there are fifteen acres of clean or "virgin" soil between the Landfill and Roundhouse. U.S. Reply [#37], 2, 4.

[11] U.S. Mem. [#3], 10; U.S. Mem. [#3] Ex. 5, at 2-3, 8.

[12] BMC Opp'n [#36] Ex. F, at 4.

[13] BMC Opp'n [#36] Ex. D, at 36; BMC Opp'n [#36] Ex. K; BMC Opp'n [#36] Ex. M, at 5; BMC Opp'n [#36] Ex. P, at 17.

desirable locations were available at Fort Devens.[14] The same report explained that the soil of the

Landfill is largely sand, and that this type of soil is conducive to "groundwater contamination

from leachate infiltration."[15] The report thus recommended measures to reduce the threat of such

leachate infiltration.[16]

By the late 1970s and early 1980s, the Army was in the process of working with

Massachusetts environmental regulators to bring the Landfill into compliance with state

environmental requirements.[17] During this time, the Army undertook a series of studies to

ascertain the impact of the Landfill on nearby water sources. Several studies identified

environmental problems associated with the Landfill. Army reports in 1978 and 1980 explained

that the Landfill was leaching contamination into Plow Shop Pond.[18] The 1978 report explicitly

identified a leachate problem with the Landfill.[19] The report observed that soil conditions at the

Landfill were capable of producing up to 25,000 gallons of leachate each day.[20] The 1978 report

further explained that ground water from the Landfill flowed northeast toward Plow Shop Pond

and recommended monitoring the ponds for contamination.[21]

---

[14] BMC Opp'n [#36] Ex. D, at 13.

[15] BMC Opp'n [#36] Ex. D, at 13.

[16] BMC Opp'n [#36] Ex. D, at 14.

[17] U.S. Reply [#37], 6.

[18] BMC Opp'n [#36], 2-5; BMC Opp'n [#36] Ex. E [hereinafter Farrell Report]; BMC Opp'n [#36] Ex. F.

[19] BMC Opp'n [#36] Ex. F, at 3.

[20] BMC Opp'n [#36] Ex. F, at 3.

[21] BMC Opp'n [#36] Ex. F, at 3.

The 1980 report, prepared by Captain Robert Farrell, made several observations. First, the report explained that the Landfill was actually capable of producing up to 118,000 gallons of leachate per day.[21] Second, the report documented that leachate had been seen migrating into and impacting Plow Shop Pond from the east.[22] The Farrell Report ultimately recommended that the Landfill be closed "as expeditiously as possible."[23]

In addition to the aforementioned studies, in 1975 the Army also initiated the Installation Restoration Program ("IRP"), which was designed to assess environmental conditions at Army installations.[24] Fort Devens was among the Army installations included in the IRP and, as a result, several studies were undertaken in 1982 to identify environmental problems on the entire 9000-acre Fort Devens area. These studies included historic photo analysis, document review, and onsite investigation. The resulting reports identified several areas of concern at Fort Devens, including the Landfill, but did not identify any concerns at or related to the Roundhouse Site.[25] For example, a 1982 Installation Assessment report explained that in the past the Landfill had "been used as an open dump, burning pit, and area fill," as well as to dispose of oil.[26] The installation assessment reiterated that leachate had been observed entering Plow Shop Pond.[27] The

---

[21] Farrell Report, 4.

[22] Farrell Report, 3, 5, 11.

[23] Farrell Report, 5-6.

[24] U.S. Reply [#37], 7.

[25] U.S. Reply [#37], 7-8.

[26] BMC Opp'n [#36] Ex. I [hereinafter Installation Assessment], at 76.

[27] Installation Assessment, 76.

Army did not file any claims related to contamination at the Roundhouse Site, or any contamination at Fort Devens, during BMC's bankruptcy proceeding.

Later events are relevant to the extent that they explain how this action came before this court and are briefly summarized. In 1989 the EPA placed the entire 9000-acre Fort Devens area on CERCLA's National Priority List. As explained, the Landfill was eventually closed in 1992. After the closure of the Landfill in 1992, the Army and EPA undertook comprehensive sampling of Plow Shop Pond to determine whether the Landfill had contaminated the pond and, if so, to what extent.[28] This sampling revealed elevated levels of arsenic, iron, and manganese in the pond, which were associated with the contamination from the Landfill. The sampling also revealed a "hot spot" adjacent to the Roundhouse Site, which contained elevated levels of antimony, copper, lead, and polycyclic aromatic hydrocarbons ("PAHs").[29] These latter contaminants were unrelated to the Landfill contamination.[30]

Additional sampling at the Roundhouse Site revealed that it also contained elevated levels of antimony, copper, lead, and PAHs. In 1995 the EPA established the "Plow Shop Pond Operable Unit" to evaluate the extent of contamination in the pond.[31] In 1999 the Army arranged for the removal and disposal of the contaminated soil at the Roundhouse Site and began excavation. Finally, in August 2013 the Army initiated removal of the contaminated sediment in

---

[28] U.S. Reply [#37], 11.

[29] U.S. Reply [#37], 11.

[30] First Simeone Suppl. Decl. ¶ 17.

[31] U.S. Reply [#37], 11; First Simeone Suppl. Decl. ¶ 18.

Plow Shop Pond.[32] The Army has incurred cleanup costs of approximately $1.6 million

attributable to the clean up of the Roundhouse Site, and expects to incur approximately $1 million

more.[33]

     B.    <u>Procedural History</u>

In 1970 BMC filed for bankruptcy protection under the Bankruptcy Act of 1898. On June

17, 1983, this court entered a Consummation Order discharging BMC from "all obligations,

debts, liabilities, and claims."[34] On January 14, 2013, Plaintiff filed the present motion before this

court. Plaintiff simultaneously filed a separate action raising the Army's CERCLA claims against

BMC, which action has been stayed pending the outcome of this motion. On June 13, 2013, this

court issued an Order allowing the parties to engage in limited discovery on the issue of whether

the Army had actual or constructive knowledge of its claim against BMC prior to the 1983

discharge date. On August 29, 2013, this court held a hearing on Plaintiff's <u>Motion for Leave to

Pursue Claim</u> [#2]. BMC objected to admission of the expert testimony of Plaintiff's witness, Mr.

Robert Simeone, on several grounds, both in its <u>Sur-Reply</u> [#42] and at the August 29 hearing.

On September 6, 2013, Plaintiff filed a <u>Motion to Admit the Testimony og Robert J. Simeone</u>

[#46]. On September 24, 2013, this court held a hearing on Plaintiff's <u>Motion to Admit

Testimony</u>. On September 27, 2013, this court allowed Plaintiff's <u>Motion to Admit Testimony</u>.

III.    <u>Discussion</u>

     A.    <u>Legal Framework</u>

---

[32] First Simeone Suppl. Decl. ¶ 8.

[33] U.S. Mem. [#3], 6.

[34] Consummation Order § 5.03, at 8.

Plaintiff seeks leave to pursue a CERCLA claim against BMC on behalf of the Army. Because BMC filed for Bankruptcy in 1970, this case and the interpretation of the Consummation Order are governed by the Bankruptcy Act of 1898.[35] The thrust of Plaintiff's argument is that the Army's CERCLA claim did not arise until well after June 17, 1983, and therefore was not discharged by the Consummation Order. The governing statutory language in this case is found in section 77 of the 1898 Act, which concerned the reorganization of railroads.[36] The Consummation Order discharged and released BMC from "all obligations, debts, liabilities and claims . . . whether or not filed or presented, whether or not approved, acknowledged or allowed in these proceedings and whether or not provable in bankruptcy."[37] The Consummation Order also enjoined the bringing of such claims against BMC.[38]

The Bankruptcy Act provides that upon discharge the debtor railroad shall be "free and clear of all claims of the debtor, its stockholders and creditors, and the debtor shall be discharged from its debts and liabilities."[39] "Creditors" are defined by the Act as "all holders of claims of whatever character against the debtor or its property, whether or not such claims would otherwise constitute provable claims under this title."[40] The Act defines "claims" to include "debts, whether liquidated or unliquidated, securities (other than stock and option warrants to subscribe to stock),

---

[35] Bos. & Me. Corp. v. Mass. Bay Transp. Auth. (MBTA), 587 F.3d 89, 98 (1st Cir. 2009).

[36] See 11 U.S.C. § 205 (repealed 1978); MBTA, 587 F.3d at 98.

[37] Consummation Order § 5.03, at 8.

[38] Consummation Order § 8.01, at 28.

[39] 11 U.S.C. § 205(f) (repealed 1978).

[40] Id. § 205(b).

8

liens, or other interests of whatever character."[41]

The purpose of section 77 is to allow a "'complete and absolute'" discharge of reorganized railroads.[42] In order for the Consummation Order to have discharged a claim, however, the claim must have existed prior to the discharge date. It is well established that section 77 operates to discharge a broad array of claims against a reorganized debtor.[43] It is also clear that statutory claims, such as those brought under CERCLA, may be discharged in a reorganization pursuant to section 77.[44] Because the definition of "claim" under section 77 includes "interests of whatever character," reorganizations under that section discharge debtors from "contingent claims" in addition to causes of action existing at the time of the bankruptcy proceeding.[45] A contingent claim is a "claim that has not yet accrued and is dependent on some future event that may never happen."[46]

The First Circuit has held that "a contingent claim for contribution to environmental

---

[41] Id.

[42] MBTA, 587 F.3d at 99 (quoting Duryee v. Erie R. Co., 175 F.2d 58, 63 (6th Cir. 1949)).

[43] Gardner v. New Jersey, 329 U.S. 565, 573 (1947) (observing the "sweeping, all inclusive definitions of 'claims' and 'creditors' in s[ection] 77"); MBTA, 587 F.3d at 100.

[44] See, e.g., MBTA, 587 F.3d at 100 ("The term 'claim' under § 77 encompasses both contract claims and tort claims, as well as statutory obligations to the government."); In re Chi., Milwaukee, St. Paul & Pac. R. Co. (Chicago II), 3 F.3d 200, 207 (7th Cir. 1993); In re Chi., Milwaukee, St. Paul & Pac. R. Co. (Chicago I), 974 F.2d 775, 781, 786 (7th Cir. 1992).

[45] MBTA, 587 F.3d at 100; Chicago I, 974 F.2d at 781; Schweitzer v. Consol. Rail Corp., 758 F.2d 936, 942 (3d Cir. 1985).

[46] Black's Law Dictionary 282 (9th ed. 2009).

cleanup costs may be discharged even if it is uncertain."[47] In Boston & Maine Corp. v. Massachusetts Bay Transportation Authority ("MBTA"), a case involving the same bankruptcy proceeding and Consummation Order at issue here, the First Circuit established the standard for determining when a contingent claim exists under section 77. First, the "law giving rise to the claim . . . must have existed before the bar date," in order to avoid constitutional concerns.[48] Second, in the context of claims for contribution to environmental cleanup costs, the claimant must have actual or constructive knowledge of the contamination. Although MBTA involved a claimant with actual knowledge of the contamination, and thus did not present "outlier facts where a potential claimant did not know of the contamination," the court made clear that constructive knowledge was sufficient.[49] Accordingly, "[a] contingent claim to recover cleanup costs exists if sufficient information was available to the prospective claimants that, if sought out, would give the plaintiff constructive knowledge of the claim."[50] Constructive knowledge is defined as "[k]nowledge that one using reasonable care or diligence should have."[51]

B.      Analysis

Whether Plaintiff will be allowed to pursue the Army's CERCLA claims against BMC thus turns on whether a contingent claim existed prior to the 1983 discharge date. Plaintiff argues that the Army had neither actual nor constructive knowledge of the contamination at the Roundhouse

---

[47] MBTA, 587 F.3d at 100; see also In re Hemingway Transp., Inc., 993 F.2d 915, 923 (1st Cir. 1993).

[48] MBTA, 587 F.3d at 100.

[49] Id.

[50] Id. at 101.

[51] Black's Law Dictionary 950 (9th ed. 2009).

Site before the discharge date.[52] Plaintiff concedes that the Army was aware of the environmental problems associated with the Landfill and knew that contamination had migrated to a discrete portion of Plow Shop Pond before 1983, but argues that the Landfill and Roundhouse Site are two separate and distinct areas.[53] Plaintiff further argues that despite numerous and diligent studies of the Fort Devens area by the Army and EPA prior to 1983, there was no indication of any environmental problems related to the Roundhouse Site.[54] Plaintiff's expert, Mr. Simeone, testified that the contamination at the Roundhouse and the associated contamination in Plow Shop Pond would not have been visible to the naked eye.[55]

BMC does not claim that the Army had actual knowledge of the Roundhouse contamination but argues that there was sufficient information available to give the Army constructive knowledge of the contamination.[56] BMC advances two primary arguments that the Army should have known about the Roundhouse contamination prior to 1983. First, BMC asserts that prior to 1983 the Landfill and the Roundhouse Site overlapped, or that the Army at least considered the boundary of the Landfill to extend so far east as to include the Roundhouse Site

---

[52] U.S. Mem. [#3], 8-9.

[53] U.S. Reply [#37], 12-14.

[54] U.S. Reply [# 37], 17.

[55] First Simeone Suppl. Decl. ¶ 5.

[56] The only issue decided today is whether there was sufficient information available to charge the Army with constructive knowledge of the contamination prior to 1983, and thus whether its CERCLA claims were discharged. This court does not decide whether BMC was ultimately responsible for the contamination, and BMC does not concede that its predecessor was responsible for any of the contamination cleaned up by the Army at the Roundhouse Site. See BMC Opp'n [#36], 7 n.2.

within its borders.[57]

Second, BMC argues that regardless of whether the Landfill and the Roundhouse overlapped, it was ultimately the Army's concern with the Landfill leachate problem that eventually led it to the Roundhouse Site, and the Army was well aware of this problem prior to 1983.[58] As such, BMC contends that the Army was on notice of the need to conduct sampling of the pond before 1983, and thus had sufficient information to give it constructive knowledge of the contamination at the Roundhouse.

       1.    <u>Relationship of the Landfill and the Roundhouse Site</u>

If the Landfill and Roundhouse site "overlapped," or the Army considered the Roundhouse to be within the Landfill's boundaries prior to 1983, the relationship between the two properties alone would likely be sufficient to give the Army constructive knowledge of its CERCLA claim. This court finds, however, that the Landfill and Roundhouse Site were always separate properties and that the Army did not consider the Roundhouse to be a part of the Landfill area.

BMC relies on several pieces of evidence to argue that the Army regularly treated the Roundhouse Site as part of the Landfill before 1983. First, BMC points out that pre-1983 Army maps showed the Landfill extending significantly further eastward than do the more modern maps relied on by Plaintiff. These maps appeared in a number of Army reports.[59] Second, BMC points

---

[57] BMC Opp'n [#36], 14-15; Sur-Reply Supp. Opp'n Mot. Leave [#42] [hereinafter BMC Sur-Reply], 3-4.

[58] BMC Opp'n [#36], 9-12; BMC Sur-Reply [#42], 3.

[59] <u>See, e.g.</u>, BMC Opp'n [#36] Ex. D, at 36; BMC Opp'n [#36] Ex. K; BMC Opp'n [#36] Ex. M, at 5. A similar map appears in a 1985 EPA report. <u>See</u> BMC Opp'n [#36] Ex. P, at 17.

to a 1978 Army document that gives a verbal description of the Landfill boundaries as: "Northern Fort Devens bounded by Shepleys Hill to the west, the reservation boundary to the north, [and] the Boston and Maine Railroad to the east . . . ."[60] Finally, BMC relies on a 2002 Army report which stated that there was some indication that "the western third of the area occupied by the roundhouse was excavated during construction of the cover system for [the Landfill]."[61] From this last piece of evidence, BMC argues that "by the Army's own design, the Landfill drains downhill across the [Roundhouse]," and thus "when government reports pre-1983 warned of leachate from the Landfill, they were necessarily warning of leachate (in part) from the [Roundhouse Site]."[62]

Plaintiff counters that the properties were historically distinct. Plaintiff contends that the maps upon which BMC relies are merely general descriptions for planning purposes, and that the best measure of the Landfill's boundaries is the area covered by the Landfill cap. This is so because only those areas containing waste materials were capped.[63] In addition, Plaintiff relies on historical aerial photographs, which were incorporated into a 1982 EPA report and show no overlap between the Landfill and Roundhouse Site.[64]

Ultimately, this court is persuaded that the properties were historically distinct. The historical photographs incorporated into the 1982 EPA report show a clear distinction between the Roundhouse Site and the area where excavation was occurring at the Landfill. Despite the fact

---

[60] BMC Opp'n [#36] Ex. M, at 1.

[61] BMC Opp'n [#36] Ex. J, at 15.

[62] BMC Opp'n [#36], 15.

[63] U.S. Reply [#37], 13.

[64] U.S. Reply [#37], 13; U.S. Mem. [#3] Ex. 5, at 8.

that some pre-1983 maps show the Landfill area to extend further eastward, these maps do not show the Landfill extending all the way to the Boston & Maine railroad. The location of the Roundhouse Site thus appears to fall outside even the extended boundaries in the maps relied on by BMC. Additionally, a 1978 map of the area depicts the boundaries of the Landfill to be roughly similar to those appearing in the modern maps relied on by Plaintiff.[65]

The 1978 verbal description also fails to show that the Army treated the properties as one. The verbal description doesn't match the map included in the document, the document itself is labeled "DRAFT," and no other maps or descriptions show the Landfill extending all the way to the Boston & Maine railroad. The 2002 report relied on by BMC is also unpersuasive. The report does not indicate what year any excavation on the western portion of the Roundhouse Site occurred. It does, however, state that excavation occurred during the capping of the Landfill.[66] Since the first phase of the capping was not undertaken until after 1983, this sheds no light on whether the Landfill drained across the Roundhouse Site before 1983, and there is no other indication that it did. For these reasons, the court finds that the Landfill and Roundhouse Site were historically distinct and not treated as a single area by the Army prior to the 1983 discharge date.

2.  The Army Did Not Have Constructive Knowledge of the Roundhouse Contamination

This court must still consider whether the Army had constructive knowledge of the contamination at the Roundhouse Site based on what it knew about the Landfill. Because "actual

---

[65] See BMC Opp'n [#36] Ex. F, at 4 (showing the easternmost area occupied by the Landfill to be far to the west of the railroad).

[66] BMC Opp'n [#36] Ex. J, at 15.

knowledge . . . of the claim is not necessary," the question is whether there was "sufficient information" available to the Army to give it constructive knowledge of its claim.[67] Prior to the 1983 discharge date, the Army was unaware of any environmental problems at the Roundhouse Site. Indeed, the site had sat essentially vacant and unused since its purchase in 1942. What the Army did know was that there were contamination problems with the Landfill, that the Landfill was leaching into a portion of Plow Shop Pond, and that the Landfill should be closed.

BMC contends that this was sufficient to give the Army constructive knowledge of the contamination at the Roundhouse: because the Army initiated testing of the pond in the 1990s due to concerns about contamination from the Landfill, and because the Army knew about this contamination prior to 1983, the exercise of reasonable care and diligence should have led the Army to sample the pond sooner.[68] BMC relies on two cases to support its argument.

BMC relies on In re Reading Co.[69] to argue that Plaintiff's claim is barred because the Army had more direct and extensive knowledge of the contamination than the Reading claimant. First, Reading did not even involve a contingent claim, but rather an actual, or accrued, claim.[70] All four elements of the Reading claimant's CERCLA claim existed before the bar date, including the incurring of response costs.[71] The Reading court's discussion of the claimant's knowledge was

---

[67] MBTA, 587 F.3d at 100-01.

[68] BMC Opp'n [#36], 9-10.

[69] 115 F.3d 1111 (3d Cir. 1997).

[70] Id. at 1125.

[71] Id.

15

thus entirely dicta.[72] In any case, the court concluded that the claimant had knowledge of its claim because: (1) the EPA had identified the site as an environmental trouble spot and the federal government had responded to cleanup needs at the site twice before the bar date; (2) the claimant knew the debtor railroad operated at the site; and (3) documents available in the bankruptcy proceeding showed that the debtor had transported hazardous materials to the site.[73] Here, the Army actually had less information available to it than the Reading claimant. Indeed, there was no indication of environmental problems at the Roundhouse before 1983.

BMC also relies on In re Chateaugay Corp.,[74] a case from the Second Circuit. BMC argues that the Army also had more information available to it than the claimant in Chateaugay. There, the claimant had its environmental claims discharged even though it did not know the location of all the sites at which hazardous waste might be found.[75] Chateaugay is of limited assistance in deciding whether the Army had constructive knowledge. Chateaugay involved claimants who sought declaratory judgment, *during the bankruptcy proceeding*, that unincurred response costs at then-unknown locations were not discharged.[76] The Chateaugay claimants knew that the debtor's businesses typically generated large amounts of hazardous waste and that the

---

[72] Id. at 1126 ("[E]ven if we were to accept the United States's argument and assume that some degree of knowledge is a prerequisite for discharge of an accrued claim (and under Schweitzer it is not), we would still hold that the claim was discharged.").

[73] Id.

[74] 944 F.2d 997 (2d Cir. 1991).

[75] See BMC Opp'n [#36], 14; see also Chateaugay, 944 F.2d at 1005.

[76] Chateaugay, 944 F.2d at 999-1000.

debtor had extensive operations at a number of sites throughout the country.[77] Chateaugay applied a different legal standard than that adopted by the First Circuit in MBTA, and does not even discuss knowledge or constructive knowledge. Chateaugay was thus decided under a very different posture and legal standard than those applicable here. In addition, the Chateaugay claimant had more information available to it than did the Army, despite not knowing the location of the waste: the claimant sought declaratory judgment specifically because it anticipated it would incur future cleanup costs associated with the debtor.[78]

The case most similar to the facts here is Am International, Inc. v. Datacard Corp.[79] Although Datacard arose under the Bankruptcy Code, "both the Act and code define dischargeable claims broadly."[80] In Datacard, the Seventh Circuit found that the claimant did not have a contingent CERCLA claim because there was not "sufficient information to tie [the debtor] to environmental contamination."[81] The Seventh Circuit reached this conclusion because there was simply no information available to the claimant about contamination at the site before the discharge date. This included: "no visible signs of contamination, no soil testing, no EPA involvement, and no publicized spills at the . . . site."[82] The court rejected an argument remarkably similar to the one BMC makes here. In Datacard, the debtor argued that because many of the

---

[77] In re Chateaugay Corp., 112 B.R. 513, 517 (S.D.N.Y. 1990).

[78] Cf. Chicago I, 974 F.2d at 781 ("[T]he determination of when a party has a claim or contingent claim seems to hinge on the nature of the claim and the posture of the case.").

[79] 106 F.3d 1342 (7th Cir. 1997).

[80] Id. at 1347.

[81] Id. at 1348.

[82] Id.

claimant's employees had previously worked for the debtor at the site at issue and either witnessed or caused hazardous spills, the claimant simply needed to have investigated its personnel files to discover the contamination.[83] The court found that since the personnel file relied on merely referenced a "product loss" rather than a spill, this was insufficient to give the claimant "sufficient information" regarding any contamination.[84]

BMC is undoubtedly correct that <u>Datacard</u> and other Seventh Circuit cases relied on by Plaintiff do not require that there be extensive documentation of or responses to contamination in order to find constructive knowledge, as that would amount to requiring actual knowledge.[85] But there does need to have been sufficient information, such that reasonable diligence would have led the Army to the contamination. And, as was the case in <u>Datacard</u>, the Army had no information regarding environmental problems at the Roundhouse before 1983. The Landfill and the Roundhouse are not the same, and knowledge of problems at the Landfill gave the Army no indication of the Roundhouse contamination. BMC is thus left with its argument that the Army "could have, and should have, followed the alleged pollution in Plow Shop Pond to the [Roundhouse] well before the bar date."[86] BMC suggests that there is no reason why the Army should have taken as long as it did to close the Landfill and sample the pond after problems were first identified.[87]

---

[83] <u>Id.</u>

[84] <u>Id.</u>

[85] <u>See</u> BMC Opp'n [#36], 16.

[86] BMC Opp'n [#36], 12.

[87] BMC Sur-Reply [#42], 5.

The case law is replete with examples of claimants having their environmental claims discharged because they ignored warning signs of contamination. The cases illustrate that "[p]arties should not be rewarded for delaying their cleanup activities," or attempting an "ostrich defense."[88] These cases, however, all involve claimants who had sufficient information to lead them to the contamination at the site relevant to their claims. Had there been information available to the Army alerting it to problems at the Roundhouse, then certainly reasonable diligence would include an investigation. But the Army did not have such information. This is not a case where the Army stuck its head in the sand and ignored evidence of contamination at the Roundhouse.

BMC argues that the Army knew it needed to sample Plow Shop Pond prior to 1983 and purposely dragged its feet in doing so because it feared that the Landfill would be shut down based on the results.[89] To support this argument, BMC cites a 1978 Army report which states that "[s]ampling the ponds could conceivably reveal contaminants which in reality originate from other discharges, but will probably be attributed to the landfill and may even cause the landfill to be closed."[90] The reality, however, is far less sinister than BMC makes things out to be. First, the preceding sentence in the report specifically identifies the town of Ayer as a potential source of contamination.[91] And, more important, the report recommends a simple solution. The report advised that the ponds be "monitored," not necessarily "sampled," and stated that "locat[ing]

---

[88] MBTA, 587 F.3d at 101, 104 (internal quotation marks omitted); see also Chicago II, 3 F.3d at 207; cf. In re Crystal Oil Co,, 158 F.3d 291, 296-97 (5th Cir. 1998) (discharging environmental claims where claimant knew of hazardous release and could ascertain debtor's identity from public records); Chicago I, 974 F.2d at 788.

[89] BMC Sur-Reply [#42], 2-3; Opp. Mot. Limine [#49], 10-11.

[90] U.S. Reply [#37] Ex. 13, at 2.

[91] U.S. Reply [#37] Ex. 13, at 2.

19

groundwater monitoring wells between the landfill and the ponds" "could show more clearly if contamination is coming from the landfill or other sources."[92] Rather than suggesting that the Army knew it needed to sample the pond but chose not to, the report indicates that the Army was taking steps to monitor the situation in a way that focused on contamination solely from the Landfill. The Army thus does not appear to have been sticking its head in the sand with regard to contamination from the Landfill either.

At the end of the day, this case is not about contamination at the Landfill or how quickly the Army cleaned it up. Plaintiff does not seek to hold BMC liable for any cleanup costs stemming from Landfill contamination.[93] The speed at which the Army closed the Landfill and sampled the pond are irrelevant since the information available before the discharge date did not in any way implicate the Roundhouse. The Army simply happened to discover the contamination related to the Roundhouse when it decided to conduct comprehensive sampling of the pond in the 1990s.

BMC's argument that the Army knew everything it needed to lead it to the contamination at the Roundhouse based on its knowledge that the Landfill was leaching contamination into Plow Shop Pond is tenuous and requires a fair bit of speculation. This argument would have required the Army to have initiated comprehensive sampling of the entire pond based on observations of leachate from the Landfill impacting a discrete section of the pond, discover the contaminants related to the Roundhouse, and then follow the discovery of those contaminants back to the Roundhouse Site, despite the fact that there was no pre-1983 indication of problems at the Roundhouse itself. Without this connection, the speed of clean up and pond sampling say little

---

[92] U.S. Reply [#37] Ex. 13, at 2.

[93] U.S. Reply [#37], 3.

about whether the Army exercised reasonable diligence with regard to the claim at issue here. Moreover, the argument assumes that the entire pond would have been sampled and that the sampling parameters would have been such as to identify the contaminants associated with the Roundhouse Site. As pointed out below, it is not at all certain this would have been the case.

Even if the speed at which the Army closed the Landfill mattered, Plaintiff's expert testified that the closure of the Landfill was entirely proper and in compliance with environmental regulations and best practices.[94] He further testified that the leachate observed entering the pond prior to 1983 was limited to an area now known as "Red Cove," and that comprehensive testing would have been an inappropriate response under then-existing and even present standards.[95] And given the limited extent of visible leachate in the pond in the early 1980s, it is not certain that had sampling been conducted it would have been broad enough in scope to reveal the Roundhouse contamination.[96] There is thus ample support to conclude that the Army exercised reasonable diligence in responding to the Landfill contamination.[97]

---

[94] First Simeone Suppl. Decl. ¶¶ 14-16, 19. BMC takes issue with the fact that Mr. Simeone relies on environmental regulations in force after 1983. BMC Sur-Reply [#42], at 2. But Mr. Simeone is familiar with regulations in effect by 1985 at the latest, he is familiar with historic practices for addressing environmental contamination, and is qualified to give his opinion on the reasonableness of the Army's pre-1983 activities based on his knowledge of present and historical practices. See Order & Memorandum [#54].

[95] First Simeone Suppl. Decl. ¶¶ 10, 12.

[96] First Simeone Suppl. Decl. ¶ 13.

[97] BMC's argument that Plaintiff "offers no evidence justifying these decades of delays and no evidence that the Landfill could not have been closed before 1983" is unpersuasive. BMC Sur-Reply [#42], 5. BMC points to no authority that would have required the Army to close the Landfill before 1983. The mere fact that closing and capping the Landfill may have taken longer than the closure of Fort Devens itself says nothing about the reasonableness of the Army's response to the Landfill leachate problem. See BMC Sur-Reply [#42], 5.

For these reasons, this court concludes that the Army did not have constructive knowledge of its CERCLA claim before the 1983 discharge date.

IV.     <u>Conclusion</u>

For all of the foregoing reasons, Plaintiff's <u>Motion for Leave to Pursue</u> [#2] is ALLOWED.

AN ORDER HAS ISSUED.

<u>/s/ Joseph L. Tauro</u>
United States District Judge
